## UNITED STATE DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| DIGNA NUÑEZ, and CARLOS NUÑEZ, on behalf of themselves and all others similarly situated, | |
| **Plaintiffs,** | |
| v. | **Case No: 6:25-cv-1403** |
| GEICO GENERAL INSURANCE COMPANY, a Foreign Profit Corporation, GRAYROBINSON, P.A., a Florida Profit Corporation, BENJAMIN LEFRANCOIS, and an individual, GARY RABIN, an individual, | **CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

### I.  Preliminary Statement

1.      In Florida, if you can't drive, you can't work.  If you can't work, you can't support yourself or your family.  This class action lawsuit targets a deliberately cruel debt collection scheme designed to extort money from the working poor by unlawfully taking away their right to drive.  The desperation caused by losing one's ability to drive, work and carry out basic functions of daily life creates tremendous pressure to find the money regardless of how badly it affects them personally.

2.      For years, Defendants have been unlawfully suspending the driver's licenses of low-income individuals who were fully compliant with Florida's mandatory insurance requirements, causing severe economic harm and hardship. Mr. Carlos Nuñez and Mrs. Digna Nuñez ("Mr. and Mrs. Nuñez) are among the victims of this unjust scheme. The fact that this illegal scheme is carried out by Geico General Insurance Company ("GEICO")—one of the largest providers of auto insurance in the United States—and one of the largest and most well respected law firms based in Florida makes it even more troubling.

3.      Plaintiffs and members of the class are generally made up of lower-income individuals.  As a result of their limited income, they can only afford to carry the minimum amount of auto insurance required by Florida law.  These amounts are routinely referred to as 10/20/10 – which means that the insured must carry $10,000 of bodily injury coverage per person, with no more than $20,000 paid per accident, and $10,000 of property damage per accident. Fla. Stat. § 324.021(7). If drivers carry these minimum limits, they are considered properly insured to drive in the State of Florida under Florida's mandatory insurance law known as the Financial Responsibility Law of 1955. *Id.*; See Fla. Stat. § 324.011 et seq.

4.      Because of the low limits of coverage and the high cost of automobiles, it is not unusual for a properly-insured Florida driver to owe more money than their insurance covers in the aftermath of a car accident. For example, a relatively minor

accident involving a new Mercedes can easily involve repair costs of $15,000. When the at-fault driver's insurance company pays the $10,000 limit of coverage, the driver still owes $5,000 to the other driver for the additional damage. These amounts that are owed over and above the amount paid by insurance routinely result in a personal judgment against the at-fault driver. Although Florida law permits the use of license suspension as a collection tool for such judgments against uninsured drivers, the statute was never intended to be used against properly-insured Florida drivers.

5.    Using the above example as an illustration, and assuming GEICO insured the Mercedes owner, it would pay out the $15,000 repair costs to its insured, and then become the owner of its insured's $15,000 claim against the at-fault driver. When GEICO acquires such a claim, it brings a lawsuit in the name of its insured and routinely obtains a deficiency judgment for the balance between what the at-fault driver's insurer paid and what GEICO paid. This type of case is called a subrogation case, through which GEICO acquires the right to collect on these judgments through lawful liens or garnishments. Because many people who purchase the statutory minimum amount of insurance do so because they have limited income, those same people also have few assets that are subject to garnishment and their wages are often exempt. Collecting on judgments from these

lower-income individuals is difficult because they simply do not have the money to pay.

6.      However, Defendants have orchestrated a scheme to extort payments from these properly-insured judgment debtors, regardless of its effect on these debtors or their families, by using collection leverage that is illegal and unjust. Defendants' scheme involves the unlawful suspension of judgment debtors' driver's licenses, which is intended to jeopardize the debtors' ability to work and support their family in order to force them into onerous payment obligations.  There is no legal basis for the suspensions, and they are orchestrated through deliberate fraud on the Florida Department of Highway Safety and Motor Vehicles ("DMV"), through which Defendants hide the fact that the judgment debtors were properly insured at the time of the accident.  By hiding this material fact from the DMV, the DMV is led to believe that the judgment debtors were uninsured and it wrongfully suspends their licenses.

7.      Once a judgment debtor's license is wrongfully suspended, Defendants tell the victims of their scheme that it may only be reinstated by entering into a separate monthly payment agreement in exchange for reinstatement.  Even after the judgment debtor gets their license reinstated through this separate agreement, Defendants continue to use the threat of additional driver's license suspension and, if a payment is missed, actual driver's license suspensions to force continued

payments under the monthly payment agreement, regardless of whether the judgment debtor can afford to pay and regardless of whether their assets would be otherwise exempt from collection efforts.

8.    These illegal suspensions cause havoc on the personal lives of the judgment debtors.  After years of timely payments, Mr. Nuñez missed a payment following a stroke that left him hospitalized for 2 months. Upon his release from the hospital, Mr. and Mrs. Nuñez learned that both their driver's licenses had been suspended at the request of Defendants as a result of violating the monthly payment agreement. Mr. and Mrs. Nuñez are reliant on a modest fixed income and endured severe financial hardship in order to make another downpayment to Defendants under a new monthly payment agreement and to pay a reinstatement fee to the DMV in order to get their driving privileges back. The toll on these families caused by this unlawful and sinister practice cannot be overstated.

9.    In addition to the hardship caused by not having a drivers' license, judgment debtors incorrectly reported as uninsured are required by the State of Florida to carry what is known as "SR22 insurance" for a period of three years following each illegal suspension. Fla. Stat. § 324.151. SR22 insurance has financial requirements that exceed the minimum requirements including that the deductible may not exceed $500 and that the insurer must pay out the coverage as though the deductible is $0. *Id.* SR22 insurance is for high-risk drivers, such as drivers who

cause accidents while uninsured or are convicted of driving while under the influence of alcohol, and can cost an additional $150 per month. Many insurance companies will not offer to cover a driver that must carry SR22 insurance and drop them from coverage as a result. The imposition of SR22 insurance requirements on Mr. and Mrs. Nuñez and the members of the class only occurred because Defendants misled the DMV to believe that they failed to carry the statutory minimum insurance during their accidents.

10.     GrayRobinson, PA's Lakeland, Florida office consists of two partners, Benjamin LeFrancois and Gary Rabin, who primarily handle subrogation cases. GrayRobinson markets their subrogation practice as a "state-wide" practice, and touts their ability to handle a "very high volume" of subrogation litigation matters for Florida's largest insurers. Defendants, GrayRobinson, Benjamin LeFrancois, and Gary Rabin accomplish this "very high volume" of low dollar cases by employing non-lawyers that handle the day to day of subrogation litigation, collections, and driver's license suspensions, merely affixing one of the attorney's signatures to the hundreds of firm subrogation filings made weekly. Whether acting pursuant to explicit instructions from GEICO, or with GEICO's knowledge and approval of this illegal collection practice, this law firm engages in the above-described license-suspension scheme on GEICO's behalf. Plaintiffs, Mr. and Mrs. Nuñez, and the

Class they seek to represent suffered economic harm as a result of Defendants'
illegal debt collection practices.

## Parties to the Action

11.    Plaintiffs, CARLOS NUÑEZ and DIGNA NUÑEZ (referred to
individually as "Mr. Nuñez" and "Mrs. Nuñez" respectfully and collectively as "Mr.
and Mrs. Nuñez"), are residents of Orange County, Florida and were residents of
Orange County, Florida at times material to this action.

12.    Mr. and Mrs. Nuñez assert these claims individually and on behalf of
all individuals similarly situated.

13.    Mr. and Mrs. Nuñez were judgment debtors to GEICO as a result of a
2012 automobile accident. Mr. Nuñez was the alleged tortfeasor and Mrs. Nuñez
was alleged to be vicariously liable as a co-owner of the vehicle driven by Mr.
Nuñez.

14.    Defendant GEICO GENERAL INSURANCE COMPANY (referred to
as "GEICO") is a Maryland corporation registered to do business in the State of
Florida.  GEICO is one of the largest automobile insurance companies in Florida and
the United States.

15.    Defendant GRAYROBINSON, P.A. (referred to hereafter as the "Law
Firm") is a Florida professional association, with its principal address at 301 E. Pine
Street, Suite 1400, Orlando, Florida 32801.  At all times material hereto, the Law

Firm acted as the legal representative for GEICO in the subrogation matter against Mr. and Mrs. Nuñez and engaged in collection efforts on GEICO's behalf.

16.    Defendant BENJAMIN LEFRANCOIS (referred to hereafter as "Mr. LeFrancois") is a partner at the Law Firm and the managing shareholder of the Law Firm's Lakeland, Florida office. Mr. LeFrancois is a resident of Polk County, Florida and was a resident of Polk County, Florida at all times material to this action.

17.    Defendant GARY RABIN (referred to hereafter as "Mr. Rabin") is a partner at the Law Firm and a shareholder of the Law Firm's Lakeland, Florida office. Mr. Rabin is a resident of Polk County, Florida and was a resident of Polk County, Florida at all times material to this action.

18.    Defendants Mr. LeFrancois and Mr. Rabin were responsible for and ran the Law Firm's Lakeland, Florida office where the Law Firm direct the collections practices at issue here.

19.    The Law Firm is marketed as a premier subrogation and debt collection firm for America's best-known insurance companies throughout Florida, specializing in all types of subrogation matters including the collection of property damage claims from auto accidents. This type of insurance defense work is referred to as a "subrogation" lawsuit, which the Law Firm explains on its website, pictured below. *See* https://www.gray-robinson.com/practice-areas/53/Subrogation (last visited April 16, 2025).

## Subrogation



Subrogation is the legal term for "standing in the shoes of," which usually involves the representation of insurance companies seeking to recover on paid losses from liable third parties, including lien negotiation and enforcement proceedings.

GrayRobinson has a Florida state-wide practice in subrogation litigation and a majority of the practice is in the area of Insurance Subrogation Law. The firm has an experienced staff and has developed a system which allows it to handle a very high volume of files in a timely manner. GrayRobinson practices in all Circuits of the State and has appeared in a majority of the County Courts. Our attorneys have lectured before the County Judges' Conference on Subrogation Law and have previously served on the Small Claims Rules Committee of The Florida Bar.

## II.     **Statement of Jurisdiction**

20.    This action arises under Chapter 96 of the United States Code, more commonly known as the Racketeer Influenced and Corrupt Organizations Act (herein abbreviated as the "RICO Act"), 18 U.S.C. §§ 1961-1964.  Pursuant to 18 U.S.C. § 1964(a), this Court has original jurisdiction over this action.

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

III.    **Factual Background**

    A.    **Defendants Exploit Florida Statutory Procedures in their Mail and Wire Fraud Scheme**

23.    In 1955 the Florida Legislature passed Chapter 324 of the Florida Statutes and established the "Financial Responsibility Law of 1955" which established minimum insurance requirements for all Florida drivers.  Fla. Stat. § 324.011.  Section 324.021(7) requires that every Florida driver must obtain "Proof of Financial Responsibility" to respond to damages if an accident occurs by having coverage in the amount of $10,000 for bodily injury to one person, $20,000 for bodily injury to two or more persons, and $10,000 for property damage.  Fla. Stat. § 324.021(7). For purposes of this Complaint, the "10/20/10" insurance requirement is identified as the "statutory minimum" amount of insurance coverage required by Florida law.

24.    This legislation, which is still in effect, includes provisions for revoking a driver's license if the driver or owner is ticketed or in a crash without having the statutory minimum amount of insurance.  Fla. Stat. § 324.121. The driver's license and registration can also be suspended "upon the written request of the judgment creditor or his or her attorney," after a judgment is entered against the uninsured driver and remains unpaid for 30 days.  Fla. Stat. § 324.121.

25.    On December 3, 1958, Florida's Attorney General was specifically asked to render an opinion as to whether a driver with the required minimum

coverage could have his or her privileges suspended "as a result of the accident in an amount in excess of the 10/20/10 limits of liability required by §324.021(7)." The Attorney General's response was as follows: "If a person is properly insured, his insurance will satisfy the judgment to the extent of the limits provided in §324.021(7), F.S.  Accordingly, your 1st question is answered in the negative." In other words, if the judgment debtor had the required minimum insurance at the time of the accident and any portion of such insurance has been tendered to the judgment creditor, no suspension should ever occur.

**B.    The Middle District of Florida Has Adopted the Attorney General Opinion**

26.    Since the 1958 Attorney General Opinion, there has been relatively little interpretation of suspension requirements of the Financial Responsibility Law. However, in *Sanchez v. State Farm et. al.*, Case No. 3:21cv-00372 ("*Sanchez*"), then Chief Judge Corrigan addressed the practice of another insurance company and its subrogation firm in seeking to suspend the driver's licenses of properly insured Florida drivers. In S*anchez* the Defendant insurance company, State Farm Automobile Insurance Company, a law firm, Hiday & Ricke, P.A., and Hiday & Ricke, P.A.'s principle, Jeff Ricke, were requesting the suspension of driver's licenses of persons who were properly insured under Florida law.

27.    By Order dated March 21, 2023, Judge Corrigan ruled that the Attorney General and Plaintiff's interpretation of Fla. Stat. § 324.021 was correct, and held:

11

> Based on the better reading of §§ 324.121 and 324.131, the DMV's reading of the statute, the persuasive authority of the Florida Attorney General Opinion, and the *Williams* case, because Sanchez carried the minimum insurance required by law, her license should not have been suspended based on the judgment entered in the personal injury action . . . [H]ere, it is undisputed that Hiday & Ricke knew that Sanchez had the required insurance when it sought suspension of Sanchez's license. Indeed, Progressive paid Sanchez's $10,000 policy limit directly to Hiday & Ricke as part of the mediated settlement. (Doc. 72-5 at 6). Thus, Hiday & Ricke's actions were in contravention of the statute.

28.     Upon information and belief, following issuance of this order in the Middle District of Florida, Defendants have made no effort to cease illegal driver's license suspensions, seek reinstatement for those judgment debtors whose driver's licenses remain illegally suspended, nor take steps to have the DMV remove the SR22 insurance obligations caused by their unlawful suspensions.  As a result, properly insured Florida drivers, including but not limited to the Nunez Plaintiffs, continue to be unable to drive as a result of Defendants' unlawful license suspension scheme.

### C.     The Law Firm And GEICO Work Together

29.     When a Florida driver is in an accident with a GEICO insured driver, GEICO is often legally responsible for paying the cost to repair or replace their insured driver's vehicle within weeks of the accident. GEICO may also pay for personal injuries caused by the accident. Once GEICO covers its insured's damages, GEICO obtains a subrogation right. Through subrogation, GEICO stands in the shoes of its insured and acquires its insured's claim against the other driver for the

amount of property damage and/or personal injuries that GEICO paid. For example, if GEICO paid $15,000 to replace its insured's vehicle and $5,000 in bodily injury costs, then GEICO obtains a subrogation right in the amount of $20,000 and may hire a law firm to pursue the GEICO driver's claim against the other driver (referred to as a "Subrogation Case").

30.     GEICO employs the Law Firm to prosecute its hundreds of Subrogation Cases throughout Florida each year. Upon information and belief, GEICO litigates Subrogation Cases with such high volume that GEICO enters into master agreements with select outside law firms and affiliated law firm employees where GEICO dictates the law firm's rules and procedures for representing it in Subrogation Cases.

31.     Upon information and belief, GEICO dictates exactly how each law firm should litigate its Subrogation Cases, including detailed steps on each stage of the litigation process, what authority the law firm has to settle, the exact format of reports that need to be sent to GEICO, and how to engage in collections. Critical to the claims advanced in this case, GEICO also *requires* its Subrogation Case law firms to suspend driver's licenses of judgment debtors who miss payments, whether they were properly insured at the time of the accident or not.

32.     Upon information and belief, GEICO hired the Law Firm and instructed the Law Firm to suspend the driver's licenses of properly insured judgment debtors if those judgment debtors failed to pay the judgments against them.

33.    In each communication and written action taken by the Law Firm against Mr. and Mrs. Nuñez and the Class, the Law Firm represented that it was acting on behalf of "GEICO Mutual Auto Insurance Company,"

**D.    The Law Firm's Debt Collection Operation**

34.    The Law Firm was founded in 1970 and is one of the most well-respected law firms based in Florida. The Law Firm has over 300 lawyers and 16 offices including offices 15 offices in Florida.[1] The Law Firm represents major fortune 500 clients and many of the nation's largest insurance companies. The Law Firm boasts past Florida Bar presidents such as John M. Stewart, members and past members of Florida's Board of Governors, and dozens of partners that have held ethics positions with the Florida Bar. The Law Firm has a robust Florida and national government affairs and lobbying group. The fact that the driver's license suspension scheme was carried out by some of the most well respected and trusted members of the Florida Bar make the allegations all the more appalling.

35.    The Law Firm's Lakeland office is organized into a debt-collection operation that employs non-lawyers to conduct pre-judgment litigation and post-judgment activities.

36.    With regard to its substantial subrogation business, the Law Firm receives and processes new cases transmitted electronically from its insurance

---

[1] https://www.gray-robinson.com/offices (last visited April 16, 2025).

company clients, including those from GEICO. Along with that transmittal packet is information about the alleged debtor-driver's insurance.

37.    Upon information and belief, based on the information received from the insurer client, a form demand letter is generated and forwarded for signature to a Law Firm attorney.

38.    Where the debtor-driver has insurance, as is the case for Mr. and Mrs. Nuñez and the Class, the debtor-driver's insurer has a "duty to defend," which is a duty to hire an attorney to appear in the litigation on behalf of the debtor-driver. Typically, the Subrogation Cases are filed in a Florida County Court, and they are immediately sent to mediation either by court order or by agreement of the parties.

39.    It is the Law Firm's practice to settle Subrogation Cases, including GEICO's Subrogation Cases, with an agreement called a stipulation that (1) requires that the debtor-driver's insurer tender payment under the policy; and (2) that the debtor-driver pay a set amount per month toward an agreed amount that is less than the full subrogation claim. But the agreement also provides that if the debtor-driver fails to make the required payments at any time, the Law Firm, of behalf of the judgment creditor, may enter judgment against the debtor-driver for the full subrogation claim plus attorney's fees, costs, and interest. This type of settlement stipulation was initially entered into by Mr. Nuñez and Mrs. Nuñez as well as many members of the Class.

40.    However, the payment plans are often for a period of 10+ years and the debtor-drivers often miss a payment at some point. When this happens, GEICO and the Law Firm will obtain a judgment against the debtor-driver, like Mr. Nuñez and Mrs. Nuñez.  For cases that proceed to judgment, GEICO assigns to the Law Firm the task, among others, of generating the communications necessary to cause the suspension of the debtor-driver's license and registration.

41.    It is the usual and common practice of the Law Firm to seek suspension of debtors-driver's driving privileges directly from the DMV even when GEICO's records show (a) that the debtor-driver had the statutorily-required minimum insurance coverage at the time of the accident, and/or (b) the debtor-driver's insurer had already paid or agreed to pay toward a judgment a portion of or the entire required minimum coverage amount, and/or (c) the debtor-driver's insurer was obligated to pay the judgment but failed to do so through no fault of the debtor-driver (*See* Fla. Stat. 324.121(b)).

42.    As part of this usual and common practice to misuse the statutory scheme and to mislead both judgment debtors and the Department of Motor Vehicles, Defendants sent judgment debtors a letter threatening driver's license suspension and the imposition of SR22 insurance requirements if the judgment was not paid.

43.    According to GEICO's website, "SR-22 and FR-44 forms are both types of financial responsibility filings required by some states for individuals convicted of certain driving offenses. The SR-22 form is commonly required in many states for drivers who have been convicted of offenses such as DUI, driving without insurance, or multiple traffic violations."[2] GEICO's website goes on to explain that an SR22 is usually associated with: DUI and DWI convictions; reckless driving; driving while underinsured or uninsured; excessive at-fault accidents or traffic violations; repeat offenses in a short period of time; failure to pay court-ordered child support; or drivers with hardship licenses.

44.    When Defendants unlawfully obtain suspension of an insured debtor-driver's license, the DMV suspension automatically triggers a requirement under Fla. Stat. § 324.151 that the debtor-driver must carry what is known as "SR22" insurance for a period of three years. This requirement should never apply to debtor-drivers that carried the statutory minimum coverage. However, because GEICO and the Law Firm hide from the DMV the fact that the judgment debtor-driver was properly insured when seeking to have their license suspended, the DMV also requires these insured debtor-drivers to carry SR22 insurance for a period of three years at a substantial additional cost of about $150 per month.

---

[2] *See* https://www.geico.com/information/sr22-details/ (last visited April 26, 2025).

45.    As part of this usual and common practice to misuse the statutory scheme and to mislead both judgment debtors and the Department of Motor Vehicles, after a subrogation judgment is entered, the Law Firm, sends the Department of Motor Vehicles, by mail or electronic communication, a form letter referencing the judgment and requesting suspension of the judgment debtor's license.

46.    According to Florida law, as interpreted by the Office of the Florida Attorney General since 1958, and Judge Corrigan's March 2023 Order, this request should never be sent in connection with properly insured debtor-drivers.

47.    As part of its license suspension scheme, Defendants' suspension requests also cause debtor-drivers to be flagged for SR22 insurance despite Defendants knowing that the debtor-driver was properly insured.

48.    As a part of its usual and common practice, after a debtor-driver's license has been successfully suspended, the Law Firm and GEICO send a letter and/or email informing the debtor-driver of the suspension and advising the debtor-driver that they may contact the Law Firm (not the DMV) to enter into a monthly payment agreement in exchange for reinstatement.

49.    Similarly, the suspension notice sent by the DMV tells the debtor-driver that they need to contact the "plaintiff's attorney" and make payment arrangements to avoid suspension.

50.    As a part of its usual and common practice, when a debtor-driver calls the number listed in the Law Firm letter, a Law Firm non-lawyer employee answers the phone and demands that the debtor-driver make a "down payment" towards their balance and agree to enter a monthly payment agreement in order to have the Law Firm take steps to reinstate their driver's license.

51.    As a part of its usual and common practice, if the debtor-driver misses a monthly payment, the Law Firm starts the suspension and reinstatement process all over again, sometimes resulting in several agreements and suspensions on the same judgment for the same debtor-driver(s) over the course of several years.

**E.    The Law Firm and GEICO Also Pursue These Practices Separately**

52.    The Law Firm's only subrogation client isn't GEICO. The Law Firm performed identical subrogation work for a litany of other insurer clients (the "Insurer Clients") and engaged in the same unlawful suspension scheme in order to force properly insured drivers to make payments on the judgments owed.

53.    Similarly, GEICO employs and supervises no fewer than six Florida subrogation law firms that perform the same license suspension activity as the Law Firm on behalf of GEICO (the "Subrogation Law Firms").

54.    The Law Firm and GEICO achieve illegal suspension through a common course of conduct that does not change when Insurer Client nor the Subrogation Law firm changes.

### F.    Factual Allegations Specific to Mr. and Mrs. Nuñez

55.    On June 16, 2012, Mr. Nuñez was involved in an automobile accident with Dale M. Pahl.

56.    At the time of the accident, Mr. Nuñez was insured by a policy through Progressive Insurance that provided $10,000 of property damage, $25,000 per person and $50,000 aggregated bodily injury coverage, and $10,000 for PIP protections. Mr. Nuñez's policy *exceeded* Florida's 10/20/10 requirements and he was properly insured under Florida Law.

57.    As a result of the accident, GEICO, as the insurer of Dale M Pahl, paid for damages to Mr. Pahl's vehicle and subsequently sought to recover those costs from Mr. and Mrs. Nuñez through a subrogation action, *Geico General Insurance a/s/o Dale M Pahl vs. Digna Nunez and Carlos Nunez*, Case No.: 2015-CA-5323-O, filed in Orange County, Florida (the "Subrogation Litigation").

58.    On December 20, 2019, the Subrogation Litigation was resolved through a settlement. In a letter from Progressive's lawyer, Joshua Parks, he explains the nature of the settlement including that Mr. and Mrs. Nuñez would be required to make monthly payments of $100/month until they paid Defendants $5,000. A copy of the December 20, 2019 Letter is attached as Exhibit A. Mr. and Mrs. Nuñez were instructed to make payment by visiting www.Gray-Robinson.com.

59.     On February 24, 2020, the settlement described by Mr. Parks, was filed with the court in a stipulation. A copy of the Nuñez Stipulation is attached as Exhibit B. The stipulation was signed by Law Firm shareholder, Gary Rabin, on behalf of his client, GEICO, standing in the shoes of GEICO's insured, Dale Pahl.

60.     According to the stipulation, Progressive Insurance had already paid Defendants $10,000, accounting for 100% of Mr. Nuñez's property damage coverage and proving that Mr. Nuñez's was properly insured. *Id.* In addition, Mr. Nuñez's agreed to pay Defendants $5,000 in $100 monthly payments. *Id.* This payment plan would have taken over 4 years to complete.

61.     Under the stipulation, if Mr. Nuñez missed a payment, then Defendants would "be entitled to a final judgment for $20,656.13." *Id.*

62.     Following the stipulation, Mr. Nuñez paid the agreed $100 per month until late 2021 when Mr. and Mrs. Nuñez missed a payment to Defendants.

63.     On December 7, 2021 Defendants entered judgment for GEICO against Mr. and Mrs. Nuñez in the amount of $10,056.13 plus interest to accrue at 4.25% per annum. A copy of the Nuñez Judgment is attached as Exhibit C.

64.     Following the entry of judgment, on or about January 2022, the Law Firm contacted the DMV by wire and/or mail, informing the DMV that Mr. and Mrs. Nuñez (1) failed to make payments as agreed in the stipulation, (2) judgment was entered against Mr. and Mrs. Nuñez, and (3) requesting that the DMV suspend Mr.

and Mrs. Nuñez's driving privileges (the "Suspension Letter"). However, the Law Firm, on behalf of GEICO *omitted* from its Suspension Letter that Mr. Nuñez was properly insured at the time of the accident and that GEICO had, in fact, received $10,000 from his insurance company.

65.     Upon information and belief, the Law Firm sends substantially similar letters seeking suspension to the DMV for each of its Insurer-clients.

66.     Upon information and belief, GEICO supervises and instructs each of its Subrogation Law Firms to send substantially similar communications to the DMV for each of its subrogation files.

67.     Between January 2022 and April 2022, Mr. and Mrs. Nuñez contacted the Law Firm and entered into an agreement under which they were required to make a down payment of $150 and promise to make monthly statements in the amount of $50 thereafter, in exchange for a reinstatement of their driving privileges.  Mr. and Mrs. Nuñez entered into this monthly payment agreement for personal, family and household purposes because they needed to drive their car for personal transportation and activities of daily life.

68.     On April 26, 2022, after making the down payment to the Defendants and agreeing to make monthly payments thereafter, Mr. and Mrs. Nuñez received a signed a consent form for them to get their driving privileges back. A copy of Mr. and Mrs. Nuñez April 26, 2022 Judgment Consent Forms are attached as Exhibit D.

69.     On April 27, 2022, Mr. and Mrs. Nuñez each paid the DMV a $171.25 Reinstatement Fee necessary to secure reinstatement of their driving privileges. A copy of Mr. and Mrs. Nuñez's receipt from the DMV is attached as Exhibit E.

70.     On April 27, 2022, Mr. and Mrs. Nuñez obtained costly SR22 insurance in order to get their driving privileges back, paying over $1,000 per year in additional premiums.

71.     Upon information and belief, the Law Firm routinely demands substantially down payments to be paid to each of its Insurer-clients and when such payment is made in addition to the promise to make additional monthly statements towards the judgment, the Law Firm provides a Judgment Consent Form to the DMV in the form of Exhibit D.

72.     Upon information and belief, GEICO supervises and instructs each of its Subrogation Law Firms to demand substantial down payments and monthly payment agreements as a condition of the Subrogation Law Firms providing Judgment Consent Forms to the DMV in the form of Exhibit D.

73.     On or about October of 2022, Mr. Nuñez suffered sudden and unexpected health issues that required open-heart surgery. Mr. Nuñez was hospitalized for almost 2 months. Notably, the Law Firm payment portal required Mr. Nuñez to log in each month to make his payment, and did not allow him to set

up a recurring payment to draw from his account automatically. Because he was incapacitated, Mr. Nuñez was unable to make his monthly payments in late 2022.

74.    On or about November 2022, Defendants contacted the DMV by wire and/or mail, informing the DMV that Mr. and Mrs. Nuñez (1) failed to make payments as previously agreed, (2) that judgment was previously entered against Mr. Nuñez, and (3) requesting that the DMV suspend Mr. and Mrs. Nuñez's driving privileges again. However, the Law Firm, on behalf of GEICO *omitted* from its communication that Mr. Nuñez was properly insured at the time of the accident and that GEICO had, in fact, received $10,000 from his insurance company.

75.    On November 14, 2022, in response to Defendants' wire or mail communication requesting suspension, the DMV sent Mr. and Mrs. Nuñez a letter informing them that their driving privileges would be suspended effective November 21, 2022 and that they may contact "Gary Robinson" [typo] in order to avoid suspension. A copy of the November 14, 2022 DMV Letter is attached as Exhibit F.

76.    On or about November 21, 2022, Mr. and Mrs. Nuñez's driving privileges were again illegally and wrongfully suspended due to the Defendants' scheme.

77.    As part of their collection efforts, the Law Firm, acting on behalf of and with the approval and/or instruction of GEICO, engaged in the practice of seeking

the suspension of Mr. and Mrs. Nuñez's driver's licenses, despite the fact that they had been properly insured at the time of the accident.

78.    Mr. Nuñez is 76 years old. Mr. Nuñez is from Ecuador and worked in the United States as a painter supporting his wife and daughter until his body and health would not allow him to continue working. Mr. and Mrs. Nuñez did not save for retirement and are on a fixed income from social security. As a result, they would be otherwise immune from judgment creditors like Defendants.

79.    In April of 2023, Mr. and Mrs. Nuñez called the Law Firm and spoke with a non-lawyer about reinstatement and were told that they needed to make a significant down payment and enter into an agreement to make monthly statements thereafter in exchange for having their driving privileges reinstated. Mr. and Mrs. Nuñez agreed to make a down payment in the amount of $150 and pay $50 per month thereafter until the $10,000 judgement was paid in full. Mr. and Mrs. Nuñez entered into this monthly payment agreement for personal, family and household purposes because they needed to drive their car for personal transportation and activities of daily life.

80.    Notably, at the stated 4.25% annual interest rate, the balance would accrue $425 per year in interest and Mr. and Mrs. Nuñez would pay $600 per year. Therefore, Mr. and Mrs. Nuñez have been forced to agree to pay Defendants $50 per month payments until the end of their lives. This is not a defect of the Defendants'

scheme, it is the purpose of it, to secure judgments that accrue interest leading to payment plans that last for life.

81.    On April 4, 2023, after making a down payment and agreeing to make monthly payments thereafter to the Defendants, Mr. and Mrs. Nuñez received a signed consent form for them to have their driving privileges reinstated.   A copy of Mrs. Nuñez's April 4, 2023 Judgment Consent Form is attached as Exhibit G.

82.    In April 2023, Mr. and Mrs. Nuñez again each paid the DMV a reinstatement fee to secure reinstatement of their driving privileges.

83.    Thus, both Mr. and Mrs. Nuñez driver's licenses have been suspended by the Florida Department of Motor Vehicles (DMV) on at least two occasions due to the actions of the Defendants despite having been properly insured at the time of the accident.

84.    Each driver's license suspension occurred because Mr. and Mrs. Nuñez allegedly failed to make payments on the judgment debt owed to GEICO, as demanded by the Law Firm on behalf of GEICO.

85.    Upon information and belief, Defendants misrepresented to the DMV that Mr. and Mrs. Nuñez' driver's licenses should be suspended pursuant to Florida law, despite having no legal basis for such suspensions.

86.    Each time their licenses were suspended, Mr. and Mrs. Nuñez were required to take complicated and financially burdensome steps to have them reinstated.

87.    Mr. and Mrs. Nuñez were required to enter into agreements that required payments to the Law Firm totaling between $1,800 and $2,000, and are paid $50 per month through the filing of this Complaint. Despite paying thousands of dollars, Mr. and Mrs. Nuñez still owe approximately $9,000.

88.    The suspensions of Mr. and Mrs. Nuñez' driver's licenses caused them significant hardship, including the inability to attend necessary medical appointments.  Mr. Nunez had open-heart surgery during this time, making it particularly difficult for the family to manage without a valid driver's license.

89.    Upon information and belief, GEICO and the Law Firm utilized the United States mail and interstate wire communications (including telephone calls and facsimiles) to threaten Mr. and Mrs. Nuñez with driver's license suspension, to request the suspension of their licenses from the DMV, and to communicate with Mr. and Mrs. Nuñez regarding the reinstatement of their licenses upon payment.

90.    For example, the Law Firm sent wire or mail correspondence to the DMV to request the suspension of Mr. and Mrs. Nuñez' driving and registration privileges.

91.     The Law Firm and the DMV, at the Law Firm's request, also sent communications to Mr. and Mrs. Nuñez informing them of the suspension and advising them to contact the Law Firm (not the DMV) for reinstatement upon entering into a monthly payment agreement.

92.     Upon information and belief, these communications contained misrepresentations of law and fact, asserting that Defendants had the legal right to suspend Mr. and Mrs. Nuñez' driver's licenses for failure to pay the judgment debt, even though Mr. and Mrs. Nuñez were properly insured at the time of the underlying accident and therefore not subject to such suspension under Florida law.

93.     The suspension letter by the Law Firm to the DMV furthered the scheme by indicating the judgment and the lack of payments, but omitted that they were properly insured at the time of the accident, leading to the unlawful license suspensions.

94.     Upon information and belief, the Law Firm engaged in a common course of conduct identical to conduct alleged herein between GEICO and the Law Firm with each of its Insurer Clients.

95.     Upon information and belief, GEICO engaged in a common course of conduct identical to conduct alleged herein between GEICO and the Law Firm with each of its Subrogation Law Firms.

96.    Mr. and Mrs. Nuñez relied on the representations made by Defendants

and were injured as a result of the unlawful driver's license suspensions.

## IV.    <u>Class Representation Allegations</u>

97.    Mr. and Mrs. Nuñez bring this action pursuant to Fed. R. Civ. P. 23, on

behalf of themselves and a class (the "Class") defined as follows:

> **<u>Class</u>**: All persons who (a) on or after June 27, 2021, (b) were
> sent a letter by the DMV substantially similar to Exhibit F to this
> complaint, (c) at the request of the Law Firm, (d) with regard to
> collection of a judgment debt owed to GEICO, and (e) where the
> debtor was insured as required by Fla. Stat. § 324.021(7) at the
> time of the accident.

98.    Mr. and Mrs. Nuñez bring this action pursuant to Fed. R. Civ. P. 23, on

behalf of themselves and a class (the "GrayRobinson Class") defined as follows:

> **<u>GrayRobinson Class</u>**: All persons who (a) on or after June 27,
> 2021, (b) were sent a letter by the DMV substantially similar to
> Exhibit F to this complaint, (c) at the request of the Law Firm,
> (d) with regard to collection of a judgment debt owed to any
> subrogation judgment holder, and (e) where the debtor was
> insured as required by Fla. Stat. § 324.021(7) at the time of the
> accident.

99.    Mr. and Mrs. Nuñez bring this action pursuant to Fed. R. Civ. P. 23, on

behalf of themselves and a class ("the Class") defined as follows:

> **<u>GEICO Class</u>**: All persons who (a) on or after June 27, 2021, (b) were
> sent a letter by the DMV substantially similar to Exhibit F to this
> complaint, (c) with regard to collection of a judgment debt owed to
> GEICO, and (d) where the debtor was insured as required by Fla. Stat.
> § 324.021(7) at the time of the accident.

100.   Mr. and Mrs. Nuñez also seek certification of the following Subclass (the "FCCPA Subclass"):

> **FCCPA Subclass**: All members of the Class, GrayRobinson Class, and Geico Class who (a) on or after June 27, 2023, (b) had their driver's license suspended in connection with a subrogation judgment as a result of an auto accident, (c) who carried the statutory minimum amount of insurance at the time of the accident, (d) who entered into a subsequent monthly payment agreement which resulted in the filing of a "Judgment Consent Form" with the DMV substantially similar to Exhibits D and G to this Complaint, and (e) made payments to any Defendant pursuant to that subsequent agreement under threat of license suspension.

## Numerosity

101.   At this time, Mr. and Mrs. Nuñez do not know the exact number of members of the Classes or Subclass; however, given the volume of Defendants' business, there are at least hundreds of members of the Class if not several thousand. Defendants have been engaged in the practices complained of for over a decade. Thus, the Class is so numerous that joinder of all members is impracticable.

## Commonality

102.   There are common questions of law and fact common to Mr. and Mrs. Nuñez and the members of the Class including:

    a.    whether the alleged use of the mails constitutes the predicate act of mail fraud under RICO;

    b.    whether the alleged use of the wires constitutes the predicate act of wire fraud under RICO;

30

c.    whether Defendants' collection practice of threatening to have debtors' driving privileges suspended under circumstances where such suspension is illegal constitutes the crime of extortion under Florida law;

d.    the extent of Defendant GEICO's direction of and participation in the collection practices at issue here;

e.    whether GEICO agreed to engage GrayRobinson with knowledge of GrayRobinson's illegal debt collection practices;

f.    whether Defendants committed an abuse of process by seeking to have debtors driving privileges suspended despite knowledge that the debtor had the requisite minimum amount of insurance which precludes such a suspension; and

g.    Whether Fla. Stat. § 324.131 permits judgment creditors, such as Defendants, from requesting that the DMV suspend the driver's licenses of judgment debtors who were properly insured at the time of the accident.

h.    Whether Defendants engaged in Abuse of Process by seeking suspension under Fla. Stat. § 324.121 are liable for the damages caused.

i.     Whether Defendants engaged in Conversion by seeking suspension under Fla. Stat. § 324.121 are liable for the damages caused.

j.     Whether Defendant GEICO engaged in Aiding and Abetting Conversion by seeking assisting the Law Firm in seeking suspension under Fla. Stat. § 324.121 are liable for the damages caused.

k.     Whether Defendants engaged in Economic Duress by seeking suspension under Fla. Stat. § 324.121 are liable for the damages caused.

l.     Whether Defendant(s) owed Plaintiffs and the Classes a duty of reasonable care in seeking driver's license suspensions under Fla. Stat. § 324.131.

m.     Whether Defendants breached their duties to Plaintiffs and the Classes when they sought and obtained driver's license suspension under Fla. Stat. § 324.131.

n.     Whether Defendants' breach of their duties was the proximate cause of Plaintiffs and the Classes damages.

o.     Whether Plaintiffs and the Classes sustained damages.

**Typicality**

103.   Mr. and Mrs. Nuñez' claims are typical of the claims of the Classes they seek to represent.  Mr. and Mrs. Nuñez, like members of the Classes, had their driving privileges suspended by the Florida DMV after notice was issued by Defendants pursuant to Fla. Stat. § 324.111, despite the fact that Mr. and Mrs. Nuñez were properly insured.  Thus, Mr. and Mrs. Nuñez' claims, like the claims of the Class, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

104.   Mr. and Mrs. Nuñez will fairly and adequately protect the interests of the Classes. Mr. and Mrs. Nuñez have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions.  Mr. and Mrs. Nuñez and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Mr. and Mrs. Nuñez nor their counsel possess interests that conflict with the Classes they seek to represent.

**Equitable Relief**

105.   The Classes meets the requirements for certification to obtain equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final

declaratory relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants regarding the manner in which they request license suspensions pursuant to Fla. Stat. § 324.111. Additionally, Mr. and Mrs. Nuñez and members of the class are currently required to carry SR22 insurance as a result of Defendants' unlawful license suspensions. Therefore, injunctive relief is appropriate to require Defendants to take the necessary steps to inform the DMV that the licenses of Mr. and Mrs. Nuñez and the class were wrongfully suspended and that therefore the SR22 insurance requirement should be lifted.

## **Predominance and Superiority**

106. The Classes also meets the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy for at least the following reasons:

      a.    Absent a class action, as a practical matter, members of the Class will be unable to obtain redress, Defendants' violations will

continue without remedy, and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## V.    Causes of Action

### COUNT I
**FLORIDA CONSUMER COLLECTIONS PRACTICES ACT ("FCCPA")**
**(Class Action Claim Against All Defendants on Behalf of Plaintiffs and the FCCPA Subclass)**

107.    Mr. and Mrs. Nuñez incorporate paragraphs 1 through 106 as if fully set forth in this Count.

108.    Mr. and Mrs. Nuñez assert this count against all Defendants on a class basis for violations of the Florida Consumer Collections Practices Act ("FCCPA").

109.    The FCCPA class definition for this claim is:

> All class members who (a) on or after April 25, 2021, (b) had their driver's license suspended in connection with a GEICO subrogation judgment as a result of an auto accident, (c) who carried the statutory minimum amount of insurance at the time of the accident, and (d) who made subsequent payment arrangements with GEICO which resulted in the filing of a "Judgment Consent Form" with the DMV substantially similar to Exhibit D to this Complaint.

110.    FCCPA § 559.55(6) defines "Debt" or "consumer debt" to mean "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." (emphasis added).

111.    If Defendants had only collected on the judgment, without more, they would have avoided FCCPA liability, as tort judgments do not typically fall within the definition of "consumer debt" under the FCCPA.  However, once the judgment debtor's license has been suspended, Defendants then forced Mr. and Mrs. Nuñez or members of the Class into separate obligations involving required "Down Payments" and a separate promise to make monthly payments thereafter in exchange for having their license reinstated.  These monthly statement agreements were then enforced through the constant threat of driver's license suspensions.  Because one's driver's license is "property" that is used by the driver primarily for personal, family or household use, the monthly payment agreement tied to the debtor's driver's license

36

constitutes a new and separate obligation.  And because these new obligations were entered into after the debtor's license was unlawfully suspended and were a condition of obtaining a letter from Defendants to the DMV stating that their driver's license could be reinstated as a result of sufficient payment arrangements having been made, these separate obligations involve more than just the collection of a tort judgment and fall within the purview of the FCCPA.

112.    After payment arrangements were made between Defendants and Mr. Nuñez, Mrs. Nuñez, and each member of the FCCPA Class, the Law Firm, or, on information, GEICO's other law firms, sent, on behalf of GEICO, a standardized "Judgment Consent Form" to the DMV allowing reinstatement of the debtor's driving privileges because "THE ABOVE DEFENDANT/DEBTOR HAS MADE SATISFACTORY ARRANGEMENTS TO PAY THE JUDGMENT ENTERED IN THE ABOVE NOTED CASE."   The Form goes on to confirm that the debtor's driver's license will continue to be used to secure monthly payments by stating: "THE JUDGMENT CREDITOR REQUESTS THAT ANY RESTRICTIONS UPON THE DRIVING PRIVILEGE, IMPOSED BECAUSE OF THIS JUDGMENT, BE REMOVED AT THIS TIME.  I WILL NOTIFY YOU IN THE EVENT THAT PAYMENTS ARE NOT MADE AS AGREED, SO THAT RESTRICTIONS MAY BE IMPOSED."  Exs. D & H, Judgement Consent Forms.

113.   The filing of a Judgment Consent Form with the DMV proves that a separate payment "arrangement" was made between GEICO and the debtor in order to have their license reinstated (including Mr. Nuñez, Mrs. Nuñez, and the FCCPA Class), and makes the "assertion" that failure to make continued payments under that separate agreement would result in additional driver's license suspensions.

114.   These Judgment Consent Forms were signed by the Law Firm, or, on information, GEICO's other law firms,  and delivered to the DMV.

115.   In relevant part, FCCPA § 559.72 provides:

> Prohibited practices generally.   In collecting consumer debts no person shall:
>
> (9)   Claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist.
>
> (10)   Use a communication that simulates in any manner legal or judicial process or that gives the appearance of being authorized, issued, or approved by a government, governmental agency, or attorney at law, when it is not.

116.   Thus, the Judgment Consent Forms were issued for Plaintiffs and each Class Member and constitute an "assertion" of the legal right to suspend in the future and constitute a "communication" giving the appearance of governmental approval.

117.   Defendants routinely violated § 559.72(9) by repeatedly asserting in the Judgment Consent Forms that they have the legal right to suspend a properly insured judgment debtor's driver's license for failure to make payments as agreed.

118.   Defendants' Judgment Consent Forms also routinely violate FCCPA § 559.72(10), which states that no person shall: "[u]se a communication … that gives the appearance of being authorized, issued, or approved by a …governmental agency, … when it is not."

119.   By repeatedly asserting to judgment debtors that their failure to pay under the monthly payment agreement, will result in the Florida DMV suspending the driver's licenses of Mr. and Mrs. Nuñez and the Class, after the DMV had already suspended their licenses at least once, Defendant's actions gave the appearance that the Florida DMV authorized or approved Defendants to make such threats as it would suspend their licenses again if they failed to make the agreed monthly payments.  The fact that Defendants misled the DMV by failing to disclose that Mr. and Mrs. Nuñez and the FCCPA Class were properly insured at the time of the accident was never disclosed to Mr. and Mrs. Nuñez or the Class, and this omission caused the Mr. and Mrs. Nuñez and the Class members to be believe the suspension threats were legitimate when they were not.

120.   As determined by Judge Corrigan's March 2023 Order, the Financial Responsibility Law of 1955 does not permit the suspension of properly insured

debtor-driver driver's licenses.    Accordingly, all correspondence and monthly payment demands that were made by Defendants under a continuous threat of having the debtor-driver driver's license suspended again and after entering into monthly payment agreements asserted a legal right that did not exist in violation of § 559.72(9) and gave the appearance that the DMV authorized such suspensions in violation of § 559.72(10).

121.   Because Mr. Nuñez, Mrs. Nuñez, and members of the FCCPA Class were properly insured at the time of the underlying accident, their licenses should never have been suspended in the first place. And once they were suspended, Defendants had no legal basis to assert the legal right to request suspension of driver's licenses again if and when they missed a payment under the monthly payment agreement. Each time they did, they violated Fla. Stat. § 559.72(9) and (10).

122.   Furthermore, Defendants routinely violated § 559.72(9) and (10) when they demanded "down payments" and new monthly payment agreements from Mr. and Mrs. Nuñez and the Class as a condition of reinstating their driver's licenses for each violation of their prior monthly payment agreements.  Because Defendants never had the legal right to request suspension of the licenses of Mr. and Mrs. Nuñez and the Class, who were properly insured, they likewise had no legal right to demand large "down payments" followed by a subsequent agreement to make specific

monthly payments as a condition of reinstating their driving privileges each time it was suspended.

123.   Mr. and Mrs. Nuñez and the class have suffered concrete harm caused by these violations of Fla. Stat. § 559.72(9) and/or (10) in the form of monetary payments made under a monthly payment agreement that was entered into after an initial suspension and as a condition of reinstatement and enforced through an unlawful threat of future driver's license suspensions.

124.   During the class period, Mr. Nuñez made several payments to Defendants as a result of Defendants either requesting suspension of his driver's license or threatening to do so.  He would not have made these payments in the manner that he did but for the unlawful threats of license suspensions repeatedly made by Defendants.  These illegally coerced payments should be refunded as actual damages.  The funds used to pay these amounts were Social Security funds and otherwise exempt from garnishment or lawful collection efforts.

125.   During the class period Mrs. Nuñez made several payments to Defendants as a result of Defendants either requesting suspension of her driver's license or threatening to request suspension of her or her husband's driver's license. Because she was living on an extremely tight budget, these payments were a significant financial hardship on Mrs. Nuñez and her family and she would not have made these payments in the manner that she did but for the unlawful threats of

license suspensions repeatedly made by Defendants. These illegally coerced payments should be refunded as actual damages. The funds used to pay these amounts were Social Security funds and otherwise exempt from garnishment or lawful collection efforts.

126. The FCCPA Class likewise made payments to Defendants after having their driver's licenses unlawfully suspended and reinstated after entering into a monthly payment agreement. These payments were only made because Defendants were asserting the right to suspend again if the monthly payments were not made, which is a legal right they did not have. These payments should be refunded as actual damages.

127. Mr. and Mrs. Nuñez and the FCCPA class should also be awarded statutory damages up to $1,000 per class member or up to 1% of Defendants' net worth, plus attorney fees and litigation costs pursuant to FCCPA Fla. Stat. § 559.77.

<u>COUNT II</u>
**COMMON LAW CONVERSION**
**(Class Action Claim Against All Defendants on Behalf of Plaintiffs and the Class, the GrayRobinson Class, and the Geico Class)**

128. Mr. and Mrs. Nuñez incorporate paragraphs 1 through 106 as if fully set forth in this Count.

129. Mr. and Mrs. Nuñez assert this count against all Defendants on behalf of the Class, GrayRobinson Class, and GEICO Class on a class basis for the tort of Conversion under Florida common law.

130.   "[T]o state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011). The essence of an action for conversion is "not the acquisition of the property of the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled." *Star Fruit Co. v. Eagle Lake Growers, Inc*., 160 Fla. 130, 33 So. 2d 858, 860 (1948).

131.   "Historically, it was only tangible property that could be converted." *Joe Hand Promotions, Inc. v. Jacobson*, 874 F. Supp. 2d 1010, 1017 (D. Or. 2012). Florida courts now recognize, however, that "[a]ctions for conversion may properly be brought for a wrongful taking over of intangible interests" as well. *In re Estate of Corbin*, 391 So. 2d 731, 732 (Fla. 3d DCA 1980).

132.   Defendants routinely, deliberately, and collectively served requests on the Florida DMV asking it to take affirmative steps to suspend the driver's licenses of Mr. and Mrs. Nuñez and the Classes. These requests were made with knowledge that Mr. and Mrs. Nuñez and members of the Classes were properly insured under Florida law at the time of the underlying accident.  The purpose of these requests was to exercise wrongful dominion and control over the driver's licenses of Mr. and Mrs. Nuñez and members of the Class and to deliberately and intentionally deprive

them of their driver's licenses as well as their right to legally drive a vehicle within the state and to subject them to criminal penalties for doing so.

133.   The intent behind this exercise of dominion over the drivers' licenses of Mr. and Mrs. Nuñez and the Classes were to force them to enter into separate arrangements involving large initial "down payments" followed by a series of monthly payments as a condition to having their license reinstated.

134.   Defendants continued to exercise improper and unlawful dominion and control over the driver's licenses of Mr. and Mrs. Nuñez and the Classes by continuously asserting that missing any single monthly payment would result in a subsequent suspension.

135.   As a direct result of Defendants' wrongful exercise of dominion over their driver's licenses and driving privileges, Mr. and Mrs. Nuñez and the Class suffered damages including payments made to release property wrongfully withheld from them, reinstatement fees paid to the DMV each time their license was reinstated, out of pocket costs to obtain rides, and lost jobs and wages as a result of not having reliable transportation.

136.   Because Defendants' actions in this regard were done deliberately and with the intent of placing Mr. and Mrs. Nuñez and the Class in financial difficulty or put their jobs and ability to support their families at risk in order to force them to

make payments, punitive damages should be awarded to Mr. and Mrs. Nuñez and the Class in addition to any other damages awarded by the Court and/or the jury.

**COUNT III**
**AIDING AND ABETTING CONVERSION**
**(Class Action Claim Against Geico Only and in the Alternative to Count II Against Geico on Behalf of Plaintiffs and the Class, and the Geico Class)**

137.  Mr. and Mrs. Nuñez incorporate paragraphs 1 through 106 as if fully set forth in this Count.

138.  Mr. and Mrs. Nuñez assert this count against GEICO on behalf of the Class and the GEICO Class for aiding and abetting the tort of Conversion under Florida common law.

139.  As set forth above, GEICO directed the Law Firm and the Subrogation Law Firms to request license suspensions from the DMV for the purpose of depriving its judgment debtor of the legal right to drive in order to force them to make payments on the judgment debts owed to GEICO.  For this reason, Mr. and Mrs. Nuñez believe that GEICO, along with the other Defendants in this matter, is directly liable for Conversion under the Conversion Count set forth above.  This claim is advanced in the alternative to the direct Conversion Count only if it is determined that GEICO cannot be held directly liable for Conversion because Law Firm and Subrogation Law Firm employees served the requests on the DMV seeking to suspend the driver's licenses of Mr. and Mrs. Nuñez and the Class.  Under this

Count, GEICO is still liable for aiding and abetting the Conversion for the conduct of the Law Firm and the Subrogation Law Firms conduct.

140.    Florida recognizes a cause of action for aiding and abetting common law torts. *AmeriFirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *see also Ft. Myers Dev. Corp. v. J.W. McWilliams Co*., 97 Fla. 788, 122 So. 264, 268 (1929) (recognizing that liability may attach for "aiders and abettors of fraudulent promoters of corporations"); *Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017) ("Florida law recognizes a cause of action for aiding and abetting the breach of a fiduciary duty."); *Roos v. Morrison*, 913 So. 2d 59, 68 n.1 (Fla. 1st DCA 2005) ("Florida courts recognize the 'acting in concert' basis for joint and several liability.").

141.    To state a claim for aiding and abetting a tort in Florida, a plaintiff must allege: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of Am., N.A*., 455 Fed. Appx. 904, 906 (11th Cir. 2012) (applying Florida law).

142.    In *Taubenfeld v. Lasko*, 324 So.3d 529, 544 (Fla. 4th DCA 2021), the Florida Fourth District Court of Appeal specifically recognized aiding and abetting the common law tort of Conversion as viable claim.

143.   Here, GEICO directed and encouraged the Law Firm and the Subrogation Law Firms to take steps to exercise dominion over the driver's licenses of Mr. and Mrs. Nuñez and the Class by making suspension requests to the DMV, after GEICO received information that the debtors were properly insured.   The suspension requests were, in fact, served on behalf of and at the direction of GEICO as the underlying judgment creditor.

144.   GEICO requires the Law Firm and the Subrogation Law Firms to make routine reports at regular intervals regarding any collection efforts taken.  As part of those reports, GEICO was aware: (a) that Mr. and Mrs. Nuñez and members of the class were properly insured at the time of the accident; (b) that funds had been paid to GEICO by the judgment debtor's insurance company showing again that they were properly insured; and that (c) despite their being properly insured the Law Firm was seeking to have their drivers' licenses suspended in order create financial pressure to make payments to GEICO on the underlying judgment debt. These steps could not have been taken without the knowledge and direction of GEICO as the judgment creditor.

145.   As a result, GEICO is liable to Mr. and Mrs. Nuñez and the Classes for aiding and abetting conversion if it is not found directly liable under the Conversion Count set forth above.

146.   As a direct result of GEICO aiding and abetting the Law Firm and the Subrogation Law Firms' wrongful exercise of dominion over their driver's licenses and driving privileges, Mr. and Mrs. Nuñez and the Class suffered damages including payments made to release property wrongfully withheld from them, reinstatement fees paid to the DMV each time their license was reinstated, out of pocket costs to obtain rides, and lost jobs and wages as a result of not having reliable transportation.

147.   Because Defendants' actions in this regard were done deliberately and with the intent of placing Mr. and Mrs. Nuñez and the Class in financial difficulty or put their jobs and ability to support their families at risk in order to force them to make payments, punitive damages should be awarded to Mr. and Mrs. Nuñez and the Class in additional to any other damages awarded by the Court and/or the jury.

### COUNT IV
### NEGLIGENCE
**(Class Claim Against All Defendants on Behalf of Plaintiffs and the Class, the GrayRobinson Class, and the Geico Class)**

148.   Mr. and Mrs. Nuñez incorporate 1 through 106 paragraphs as if fully set forth in this Count.

149.   At all relevant times, the Law Firm was acting as the legal representative of its judgment creditor client – GEICO in connection with an automobile accident subrogation claim and subsequent judgment collection against the Nunez Plaintiffs and the Class.

48

150.    Pursuant to Florida Statutes § 324.121, a judgment creditor or their agent may apply to the Florida Department of Highway Safety and Motor Vehicles ("DMV") to suspend a judgment debtor's driver's license by asserting, directly or indirectly, that the judgment debtor was uninsured at the time of the accident giving rise to the judgment.

151.    By electing to submit such a request to the DMV, Defendants undertook a legal and statutory responsibility to act truthfully and with reasonable care in verifying the debtor's insurance status before seeking suspension of their driving privileges under the Financial Responsibility Law of 1955.

152.    According to reasonable law firms and insurance companies acting as experts within the Florida Subrogation lawsuit space, Defendants owed Plaintiffs and the Class a duty of care, arising from:

  a.  The foreseeable and severe consequences of a license suspension;

  b.  Defendant's extrajudicial conduct in invoking administrative action under color of law;

  c.  Defendant's unique position to verify the truth of the certification using claim files, accident reports, and court records, and payment receipts;

  d.  And Florida law recognizing that individuals and entities undertaking to act under statutory authority must do so reasonably and in good faith.

153.    Defendant breached its duty by negligently submitting or causing to be submitted a certification to the DMV falsely stating that Plaintiff was uninsured at the time of the subject accident and judgment.

154.    In fact, Plaintiffs and all Class Members were properly insured at the relevant time of the accident, and this was reasonably known or knowable to Defendants through basic inquiry or review of case file materials within their own possession and control.

155.    As a direct and proximate result of Defendant's negligent conduct, the driver's licenses of Plaintiffs and the Classes were unlawfully suspended.

156.    Plaintiffs and the Class suffered damages including but not limited to:

    a.  Loss of driving privileges;

    b.  Emotional distress;

    c.  Involuntary payments made to reinstate the license;

    d.  Lost wages and employment opportunities;

    e.  Transportation costs; and

    f.  Reputational harm.

157.    Plaintiffs and the Class demand judgment against Defendants for compensatory damages and such other and further relief as the Court deems just and proper.

## COUNT V
## ECONOMIC DURESS
### (Class Claim Against All Defendants on Behalf of Plaintiffs and the Class, the GrayRobinson Class, and the Geico Class)

158.   Mr. and Mrs. Nuñez incorporate 1 through 106 paragraphs as if fully set forth in this Count.

159.   This Count is for Economic Duress against all Defendants on behalf of Mr. Nuñez, Mrs. Nuñez, and the Classes.

160.   Under Florida law, economic duress permits an aggrieved party to rescind an agreement that was entered into under severe financial anxiety or pressure. The aggrieved party must show: (1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action.

161.   After the driver's licenses of Mr. and Mrs. Nuñez and the Class were suspended due to unlawful requests Defendants made to the DMV, Mr. and Mrs. Nuñez and members of the class were placed under economic duress and in a state of financial distress because without a driver's license many of the routine tasks of daily life become extremely difficult, including commuting to work, school obligations for young children, caring for elderly parents, and running otherwise routine errands such as grocery shopping and attending medical appointments.

162.   Because the Florida DMV was not informed that Mr. and Mrs. Nuñez and the Classes were properly insured at the time of the underlying accident, the

DMV was under the mistaken impression that Mr. and Mrs. Nuñez and members of the class were uninsured at the time of the accident. As a result, the DMV would only reinstate the driver's licenses of Mr. and Mrs. Nuñez and the Class if and when a "Judgment Consent Form" was filed by Defendants giving the DMV permission to reinstate the licenses because separate payment arrangements were made. This information was conveyed by the DMV to Plaintiffs and members of the class.

163.    As a result, there was no reasonable alternative course of action to Mr. and Mrs. Nuñez and Class members other than having to agree to make a down payment followed by entering into a monthly payment agreement as required by Defendants as a condition of reinstatement.

164.    Agreeing to make a down payment followed by monthly payments was the only option available to Mr. and Mrs. Nuñez and the Classes as they were unaware that Defendants did not have the legal right to suspend their licenses. Because these threats were made after their license had been suspended once already, Mr. and Mrs. Nuñez and the Classes had no reasonable choice but to pay in order to avoid the financial hardship of subsequent suspensions. Because Mr. and Mrs. Nuñez and members of the Classes were under economic duress when they agreed to make such payments, all payments made by Mr. and Mrs. Nuñez and the Classes as a condition of driver's license reinstatement should be returned with interest.

## COUNT VI
## VIOLATION OF THE FEDERAL RICO ACT UNDER 1962(c)
### Class Claim Against All Defendants on Behalf of Plaintiffs and the Class)

165.   Mr. and Mrs. Nuñez incorporate paragraphs1 though 106 as if fully set forth in this Count.

166.   This Count is for violation of the Federal RICO Act against all Defendants on behalf of Mr. Nuñez, Mrs. Nuñez, and the Class.

167.   The association in fact between GEICO, the Law Firm and Defendants LeFrancois and Rabin is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). (Hereafter, this enterprise will be referred to as the "Illegal License Suspension Enterprise," or "the Enterprise.")

168.   Upon information and belief, the Enterprise has been in operation for at least five years.

169.   GEICO, the Law Firm and Defendants LeFrancois and Rabin jointly direct the affairs of the Enterprise, with each playing a distinct and necessary role in that direction.

170.   Defendants LeFrancois and Rabin direct the affairs of the Enterprise through their management of the attorney-client relationship between the Law Firm and GEICO and through their establishment and management of operation of the subrogation collection function of the Law Firm, including their drafting and/or

approval of the Law Firm's form mail and wire communications that threaten illegal suspension and request the DMV to issue suspensions.

171.   The Law Firm directs the affairs of the Enterprise through its employment, supervision, and training of the non-lawyer staff that does most of the work on the Firm's subrogation work for GEICO and through its regular reports on these activities to GEICO.

172.   GEICO directs the affairs of the Enterprise, upon information and belief, by referring subrogation cases to the Law Firm for collection with the knowledge and intention that the Law Firm would use the illegal means described in its collection efforts. Upon information and belief, GEICO requires that the Law Firm take these actions on its behalf, and requires that the Law Firm report all such efforts to GEICO on a regular basis.

173.   The Enterprise is engaged in activities affecting interstate commerce, to wit, the representation of a nationwide insurance company that is based in Maryland.

174.   The Enterprise regularly uses the interstate wire system in its affairs, including the initial referral of a case from GEICO to the Law Firm, the Law Firm's transmission of case reports back to GEICO, and/or the communications between the Law Firm and the DMV concerning license suspensions and reinstatements, and/or communications concerning license suspensions and reinstatements with the

victim judgment debtors, that is, Plaintiffs and the Class members. Each of these referrals, reports and communications are chargeable acts of wire fraud in that they occurred in furtherance of the scheme to defraud Mr. and Mrs. Nuñez and the members of the Class, as well as the DMV.

175.   The Enterprise regularly uses the United States mail in its affairs. The letters that, upon information and belief, the Law Firm mailed to Mr. and Mrs. Nuñez and the Class, using the threat of an illegal license suspension to induce them to pay a debt, and the ones it mailed to the DMV seeking the suspension of Mr. and Mrs. Nuñez' and the Class members' driver's licenses on repeated occasions and/or requesting reinstatement of Mr. and Mrs. Nuñez' and the Class members' driver's licenses (while withholding the fact that Mr. and Mrs. Nuñez had the required minimum insurance and had already tendered  payment under their policies to GEICO), constitute chargeable acts of mail fraud in that they were sent in furtherance of a scheme to defraud Mr. and Mrs. Nuñez, the Class, and the DMV.

176.   The conduct alleged herein also constitutes extortion under Florida law. Florida Statute § 836.05 states that whoever, by written or printed communication, maliciously threatens an injury to the property of another with intent to extort money or to do an act against her will has committed extortion.

177.   The mail and/or wire communications made to Mr. and Mrs. Nuñez and the Class threatening to have their driver's licenses suspended unless payments were

made on the judgment debts being collected by the Law Firm, constitute chargeable acts of extortion as additional RICO predicate acts.

178.   These were not isolated acts of wire or mail fraud and/or extortion. On the contrary, they were part of a pattern of hundreds, if not thousands, of similar acts of wire or mail fraud and/or extortion conducted over a period of many years and, upon information and belief, are still continuing today.

179.   By way of illustration, on or about January 2022 and November 2022 Defendants sent at least two wire or mail communications to the DMV requesting the suspension of the Nunez' driver's licenses. On or about April 2022 and April 2023 Defendants sent at least two wire or mail communications to the DMV requesting reinstatement of the Nunez' driver's licenses. In addition, Defendants made multiple wire and mail communications to the Nunez' directly, threatening to illegally suspend or continue the illegal suspension of their driver's licenses if they did not make the demanded payments. This pattern repeated across all Class members.

180.   In violation of 18 U.S.C. § 1962(c), Defendants conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity, specifically, mail and wire fraud and extortion.

181.   Mr. and Mrs. Nuñez suffered economic harm by reason of the said violation of 18 U.S.C. § 1962(c), including monetary harm each and every time they

paid the Law Firm (under the threat of suspension or in order to obtain reinstatement of the illegal suspended licenses) or paid the DMV to reinstate their license as a result of Defendants' scheme.

182.   By reason of the damages directly sustained by Mr. and Mrs. Nuñez and the Class from the injuries to their business and/or property, they are entitled to treble damages, as well as reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VII
## VIOLATION OF THE FEDERAL RICO ACT UNDER 1962(d)
### (Class Claim Against All Defendants on Behalf of Plaintiffs and the Class)

183.   Mr. and Mrs. Nuñez incorporate paragraphs 1 through 106 as if fully set forth in this Count.

184.   This Count is for violation of the Federal RICO Act against all Defendants on behalf of Mr. Nuñez, Mrs. Nuñez, and the Class.

185.   In violation of 18 U.S.C. § 1962(d), each Defendant conspired to violate 18 U.S.C. § 1962(c), in that, with actual or constructive knowledge of the fraudulent nature of the debt collection tactics to be employed by the Enterprise each Defendant mutually agreed that these illegal tactics would be used, employing the interstate mail and wire systems to threaten judgment debtors with license suspensions Defendants had no legal right to obtain, and to fraudulently request DMV to suspend

the licenses of drivers who, in fact, had the required insurance coverage at the time of their accidents and therefore were not subject to suspension under Florida law.

186.   By reason of the economic injuries directly sustained by Mr. and Mrs. Nuñez and the other members of the Class, they are entitled to an award of treble damages against Defendants, as well as reasonable attorney's fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII
## ABUSE OF PROCESS
### (Class Claim Against All Defendants on Behalf of Plaintiffs and the Class, the GrayRobinson Class, and the Geico Class)

187.   Mr. and Mrs. Nuñez incorporate paragraphs 1 through 106 as if fully set forth in this Count.

188.   This Count is for violation of the Abuse of Process against all Defendants on behalf of Mr. Nuñez, Mrs. Nuñez and the Classes.

189.   Under Florida law, "[a] cause of action for abuse of process contains three elements: (1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process; and (3) that, as a result of such action on the part of the defendant, the plaintiff suffered damage." *S & I Investments v. Payless Flea Market, Inc*., 36 So. 3d 909, 917 (Fla. 4th DCA 2010).

190.   In order to further the shared purpose of collection of amounts due from judgment debtors, the Defendants initiated the suspension of Mr. and Mrs. Nuñez'

driver's licenses with the Florida DMV pursuant to the process for suspending driver's licenses of judgment debtors under Fla. Stat. § 324.111.

191.    The initiation of the process for suspension of the drivers' licenses of Mr. and Mrs. Nuñez and the Class was illegal and improper because Mr. and Mrs. Nuñez and members of the Class were properly insured pursuant to the 10/20/10 minimum required limits.

192.    The Defendants' improper malicious and ulterior motive or purpose in improperly using the administrative functions of the DMV, pursuant to the entry and submission of the judgment by the trial court pursuant to § 324.111, was for the exclusive purpose of abusing and harassing Mr. and Mrs. Nuñez and  the Class in order to put pressure on Mr. and Mrs. Nuñez and the Classes to pay money towards their judgment debt for Defendants' own pecuniary gain.

193.    As a result of Defendants' abuse of process, Mr. and Mrs. Nuñez and the Classes had their drivers' licenses wrongfully suspended.

194.    Thus, Defendants are liable for abuse of process because their use of the DMV to suspend the driving privileges of Mr. and Mrs. Nuñez and the Classes were not justified pursuant to § 324.111; rather, Defendants knowingly abused the "process" of requesting revocation of drivers' licenses for the purpose of extorting Plaintiffs and the Classes for Defendants' own pecuniary gains. *See S & I Investments*, 36 So. 3d at 917.

195.   The suspension of Mr. and Mrs. Nuñez' driver's license caused injury to the property of Mr. and Mrs. Nuñez as follows:

    a.  loss of their driver's license and driving privileges;

    b.  the out-of-pocket costs associated with the loss of their driver's license, including but not limited to loss of employment, costs of transportation, costs associated with criminal charges, if any, as a result of driving on a suspended license;

    c.  The payment of reinstatement fees to the DMV each time their license was reinstated after suspension, which should never have been suspended;

    d.  The cost of SR22 insurance, which they should not have had to pay; and

    e.   Other harms and losses to be proved at trial.

196.   Under Florida law, a plaintiff is entitled to recover "special damages" in an action for abuse of process.  *See Bothmann v. Harrington*, 458 So. 2d 1163, 1170 (Fla. 3d DCA 1984).

197.   The "special damages" recoverable are the pecuniary losses resulting directly and immediately from the tort and the expenses incurred to counteract such abuse of process.  *Id.*

198.   In addition, punitive damages are also recoverable in an abuse of process action where a plaintiff establishes actual malice or that "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge,

60

intentionally pursued that course of conduct, resulting in injury or damage." *Id.* at 1171; Fla. Stat. § 768.72.

199.    "Malice" as defined under Florida law means "intentionally" and "without lawful justification."   *O'Flaherty-Lewis v. State*, 230 So. 3d 15 (Fla. 4th DCA 2017).

200.    Defendants intentionally initiated the suspension of Mr. and Mrs. Nuñez' and other Class members' driver's licenses knowing they were without lawful justification to do so because Mr. and Mrs. Nuñez and the Class members had purchased the requisite minimum insurance.  Defendants even refused to reinstate Mr. and Mrs. Nuñez' driver's licenses after being provided ample proof that the suspension was unlawful under the 1958 Attorney General opinion and being given the opportunity to do so.  Accordingly, Mr. and Mrs. Nuñez and the Class are entitled to punitive damages for Defendants' actual malice in perpetrating the abuse of process.

201.    By reason of the damages directly sustained by Mr. and Mrs. Nuñez and the Classes from the injuries to their property, including the suspension of their driver's licenses and the payment of money, they are entitled to special and punitive damages resulting from Defendants' acts, as well as an award of court costs.

**COUNT IX**
**UNJUST ENRICHMENT**
**(Class Claim Against All Defendants on Behalf of Plaintiffs and the Class, the GrayRobinson Class, and the Geico Class)**

278.   Mr. and Mrs. Nuñez incorporate paragraphs 1 through 106 as if fully set forth in this Count.

279.   This Count is for Unjust Enrichment against all Defendants on behalf of Mr. Nuñez, Mrs. Nuñez and the Classes.

280.   Florida courts have long recognized a cause of action for unjust enrichment "to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." *Butler v. Trizec Props., Inc.,* 524 So. 2d 710, 711 (Fla. 2d DCA 1988).

281.   Mr. and Mrs. Nuñez and  the Classes conferred a benefit upon Defendants in the form of money payments made under threat of Defendants' illegal driver's license suspension scheme.

282.   Defendants voluntarily accepted and retained the financial benefit conferred.

283.   Under the circumstances of Defendants illegal driver's license suspension scheme, wherein Defendants violated Florida law and made threats to Mr. and Mrs. Nuñez and the Classes to coerce payments by taking away their ability to drive a vehicle, it would be inequitable for Defendants to retain the benefit.

284.   Under Florida law, the common law persists unless it is expressly overridden by statute. *See, e.g.*, *State v. Ashley*, 701 So. 2d 338, 341 (Fla. 1997) ("Even where the legislature acts in a particular area, the common law remains in effect in that area unless the statute specifically says otherwise ...."); *Thornber*, 568 So. 2d at 918 ("Whether a statutory remedy is exclusive or merely cumulative depends upon the legislative intent as manifested in the language of the statute").

285.   Defendants' violation and abuse of Florida Statutes § 324.121 may serve as the basis of an unjust enrichment claim even where the statute has no private right of action. *See, Thornber v. City of Fort Walton Beach*, 568 So. 2d 914, 918 (Fla. 1990)).

202.   Because Mr. and Mrs. Nuñez and members of the Classes were subjected to Defendants' unlawful license suspension scheme when they agreed to make  payments on their judgment debts, it would be contrary to the fundamental principles of equity and justice to allow Defendants to retain these ill-gotten gains. As a result, all payments made by Mr. and Mrs. Nuñez and the Class under threat of driver's license suspension should be returned with interest.

## COUNT X
### RELIEF UNDER THE DECLARATORY JUDGMENT ACT
### 28 U.S.C. § 2201, *et seq.*
### (Class Claim Against All Defendants on Behalf of Plaintiffs and the Class, the GrayRobinson Class, and the Geico Class)

203.   Mr. and Mrs. Nuñez incorporate paragraphs1 through 106 as if fully set forth in this Count.

204.   This Count is for Declaratory Judgement against all Defendants on behalf of Mr. Nuñez, Mrs. Nuñez and the Classes.

205.   Declaratory relief "is intended to minimize the danger of avoidable loss and the unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (4th ed.).

206.    The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, offers a unique mechanism by which a party may seek to remedy and prevent ongoing harm in the form of declaratory and injunctive relief.

207.   Pursuant to 28 U.S.C. § 2201(a), the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." As such, this Court has the power to make binding declarations of the rights and obligations of the parties, and to adjudicate the disputes between them.

208.   There is an actual controversy between Defendants, Mr. and Mrs. Nuñez, members of the Class and Defendants concerning the rights and obligations

of the parties with regard to whether a properly insured Florida driver can have their driver's license suspended under Fla. Stat. § 324.131.

209.   Because Mr. and Mrs. Nuñez and members of the Classes carried the minimum required insurance at the time of the accident, they never should be subject to suspension under Fla. Stat. § 324.131.

210.   Defendants, on the other hand, assert that there are no requirements in Chapter 324 which prohibit a creditor from requesting a license suspension even when they know that the judgment debtor had the amount of insurance required by Florida law and even when they have already been paid under the qualifying policy.

211.   The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Mr. and Mrs. Nuñez and members of the Classes still owe money to GEICO and other Insurer Clients on judgments that are being collected by Defendants, the Subrogation Law Firms, and Insurer Clients, and so continuously face the threat of missing a payment and being subjected to illegal driver's license suspension. In addition, considering the number of drivers on Florida roads covered by GEICO Insurance, Mr. and Mrs. Nuñez and members of the Class are relatively likely to be involved in accidents involving GEICO-insured drivers in the future, which could lead to additional license suspensions without good cause.

212.    Accordingly, Mr. and Mrs. Nuñez seek a declaratory judgment from this Court on whether Fla. Stat. § 324.131 can be used to suspend driver's licenses of judgment debtors who had the required insurance at the time of the accident.

213.    The declaratory relief requested herein will generate common answers that will settle the controversy related to Defendants' actions regarding license suspensions. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## JURY DEMAND

Mr. and Mrs. Nuñez hereby demand a trial by jury on all issues so triable.

Dated:  July 25, 2025

**VARNELL & WARWICK, P.A.**

By:    /s/ Jeffrey L. Newsome, II
       Jeffrey L. Newsome, II; FBN: 1018667
       Brian W. Warwick; FBN:  0605573
       Janet R. Varnell; FBN:  0071072
       Christopher J. Brochu: 1013897
       Pamela Levinson, 538345
       400 N. Ashley Dr., Ste. 1900
       Tampa, FL  33602
       Telephone:  (352) 753-8600
       Facsímile:  (352) 504-3301
       *jnewsome@ vandwlaw.com*
       *bwarwick@vandwlaw.com*
       *jvarnell@vandwlaw.com*
       *cbrochu@vandwlaw.com*
       *plevinson@vandwlaw.com*
       *ckoerner@vandwlaw.com*

**LANGER GROGAN & DIVER, P.C.**

/s/ Irv Ackelsberg
Irv Ackelsberg (Pro Hac Vice pending)
Mary Catherine Roper (Pro Hac Vice pending)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Telephone: (215) 320-5660
Fax: (215) 320-5703
iackelsberg@langergrogan.com
mroper@langergrogan.com

***Attorneys for Plaintiffs and the Class***